[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The husband, 41, and the wife, 38, married on March 18, 1978 in New York City. The plaintiff has resided continuously in this state for over one year prior to commencing this action for dissolution thereby affording the court jurisdiction. Only two children were born to the defendant, issue of the marriage, Ellen Amelia, date of birth December 19, 1985 and Andrew Joseph, date of birth May 17, 1989.
The plaintiff obtained a B.S. degree in mechanical engineering from Rutgers University in May 1979. Soon thereafter, the parties moved to Connecticut, settling in Tolland. The plaintiff received a master's degree in engineering in August, 1981. The plaintiff has been employed in the glass industry, currently by Emhart Glass, at a weekly wage of $1,108.20 gross and, after taxes and insurance deductions, $774.37 net (cf. plaintiff's financial affidavit dated July 26, 1994).
The defendant obtained a B.S. degree in nursing in 1977 and was employed by the U.S. Public Health Service on Staten Island, New York where she also lived. She had managed to save $10,000, which she had at the time of the marriage. She began law school in 1980, graduating from Western New England Law School in May, 1983. The defendant had worked for the Rockville Public Health Department. In March, 1984 she was hired by Beck Pagano, a law firm located in Manchester, Connecticut. On January 1, 1996 the defendant became a partner in the firm which became known as Beck CT Page 9739 Eldergill. In addition to the law practice, the defendant was also able to buy into BRMC, a real estate company that furnished some modest additional income. The name partner, attorney Bruce Beck testified describing the defendant's legal skills as "exceptional" and "excellent" with concentration in domestic relations and various aspects of real estate. The court notes that the law firm accommodated the defendant's first pregnancy by allowing substantial time off and flex time thereafter; a similar arrangement addressed the defendant's second pregnancy. The defendant's career continued to blossom until attorney Bradford Goodwin, an associate hired approximately in late 1989 or early 1990, began an office romance with the defendant. They began meeting in a darkened office, at motels and conducted an affair. The defendant's legal work suffered. Attorney Goodwin left the firm during February or March, 1993. The defendant was terminated in August, 1993.
The defendant's earning capacity is demonstrated by her partnership income for 1986 of $32,297.00, 1987 of $40,926.00, 1988 of $75,396.00, 1989 of $79,899.00, 1990 of $83,403.00 1991 of $139,873.00 and $56,800.00 of 1992. For eight months of 1993 the defendant earned $69,519.00, (plaintiff's Exhibits #26 and #33). The plaintiff's gross earnings have never exceeded $60,000.00.
The parties have stipulated that the marital home known as 37 Maplewood Drive, Tolland has a fair market value of $210,000.00. They also stipulated that their "retirement" home in New Hampshire has a fair market value of $145,000.00 and, if sold, should net $135,000.00 gross receipts after commission and other closing adjustments.
The plaintiff has continued to occupy the marital home since the defendant moved out on March 11, 1993. The parties had an initial confrontation over the defendant's stated intention to separate resulting in the first ever physical force inflicted by the plaintiff on the defendant. This occurred at the end of February, 1993. Although the defendant claims an earlier episode occurred in September 1992, the court is not convinced of defendant's version. After leaving the family home with the children, the defendant requested the opportunity to return on the following weekend and she did so on Saturday, March 13, 1993 in the midst of a blizzard. After another physical contact by plaintiff pushing the defendant, the plaintiff disabled her car, brought the children into the house, repaired defendant's car, refused to return the children when asked to do so by the defendant, but CT Page 9740 eventually allowed the children to leave. One of the issues leading to the foregoing was the defendant's refusal to reveal where the children were then living. A day or two later the defendant told the plaintiff she and attorney Goodwin were living together in the next town, and that she was never coming back.
The next time the plaintiff was able to pick up the children he kept them with him for eight or nine days.
On March 23 the parties met and developed a split custody schedule. On the same day, the defendant applied for a temporary restraining order pursuant to § 46b-15 which was granted exparte on March 26, 1993 (Kaplan, J.) in Tolland J.D. #52682. No order was addressed to custody or visitation. By stipulation of April 1, the parties agreed that the order be extended except the plaintiff be allowed to contact the defendant at her office for matters pertaining to the children. On October 7, 1993 the T.R.O. was extended until further order of the court. It has remained in effect.
In this case on April 1, 1993, the parties agreed to "joint shared custody" in accordance with an attached schedule on which was outlined April and May. On June 1, 1993 custody and visitation were referred to Family Relations. On June 16, 1993 the parties stipulated that the defendant be given sole custody and the plaintiff given visitation every other weekend from Friday evening until Monday morning and on those weeks with no weekend visitation, from Tuesday afternoon until Wednesday morning. Direct contact between the parties was eliminated. On October 7, 1993 the plaintiff's weekend visitations ended at the Mansfield Resident Trooper Barracks, as stipulated by the parties.
The plaintiff demonstrates anger and is upset by his wife's infidelity. The defendant demonstrates a total lack of understanding why her adultery upsets the plaintiff. Both parties need counselling. Only the plaintiff has sought it.[1]
A very detailed Family Relations Custody Study was completed on July 5, 1994 (Plaintiff's Exhibit #1). It recommends that the defendant have custody and the plaintiff have extensive visitation.
Until the breakdown of the marriage, which the court finds was caused by the defendant's adultery, she was the primary day-to-day caretaker of the children. Although the plaintiff father willingly participated in caring for the children, he was not the primary CT Page 9741 caretaker. Both parents are capable of caring for the children and are equally fit. This finding is not meant to endorse the conduct of either party. Since the commencement of this action the plaintiff allowed the former wife of attorney Goodwin to move into the marital home, and she brought along the Goodwin children.
The attorney for the minors has recommended joint legal custody. Neither party sought joint custody. The provisions of § 46b-56a have not been implemented. Emerick v. Emerick, 5 Conn. App. 649,656 et seq.; Tabackman v. Tabackman, 25 Conn. App. 366,368. Both the plaintiff's complaint and the defendant's answer seek "custody." The court cannot impose joint legal custody in this case.
The primary test is the best interests of the children, a very noble principle but often difficult to apply. The children are entitled to the love and affection of both parents and this state encourages the nurturing of the children by the non-custodial parent as well as the custodial parent. Seymour v. Seymour,180 Conn. 705, 712.
Other elements considered and given weight in Seymour were the time each parent would be able to devote to the children on a day-to-day basis and the flexibility of each parent to best serve the psychological development and growth of the children. Id., p. 711. Clearly, in the present case, the defendant has demonstrated an ability to utilize flex time and to organize her practice around the needs of the children. The plaintiff has not had this ability and his assertion to the Family Relations Department counsellor that Mrs. Goodwin would help him was negated by his testimony at trial that although she apparently had fallen in love with him, his ardor had cooled and she would be leaving his home on August 1st.
The defendant has been obligated to travel extensively for his present employer, both stateside and overseas to Czechoslovakia, China and Peru, (Defendant's Exhibit I).
Regarding the defendant's adultery as impacting on the custody issue, it is correct that a party's morals as demonstrated by conduct may be considered by the court. Adams v. Adams, 180 Conn. 498;Sullivan v. Sullivan, 141 Conn. 235. The plaintiff's living with Mrs. Goodwin occurred after the breakdown and is not considered as bearing on fault. Venuti v. Venuti, 185 Conn. 156. The court can consider the behavior of each party to the time of trial in determining how each party's behavior may impact the CT Page 9742 child, for the question is not who was the better custodian in the past, but which party is the better custodian now. Yontel v.Yontel, 185 Conn. 275, 283.
The court had little evidence from which to conclude how either party's living with a member of the opposite sex impacted the children, Gallo v. Gallo, 184 Conn. 36, 39 et seq. Neither attorney Goodwin nor Mrs. Goodwin was called to testify.
The custody of minor children is not finally determined until entry of the decree dissolving the marriage. Hall v. Hall,186 Conn. 118, 122. The court is obliged to evaluate all of the evidence in light of the statutory criteria and the applicable case law. This court has done so.
When the defendant left Black Eldergill she received about $15,600 in August, 1993 from BRMC Limited Partnership, (Plaintiff's Exhibit #28). Her payout for her interest in the law practice was $20,458.96, (Plaintiff's Exhibit #27). She received a $19,020.46 refund of her pension plan at her former office on May 3, 1994 (Plaintiff's Exhibit #28), which the defendant rolled over into an IRA.
The statute concerning assignment of property, § 46b-81(c) enumerates several criteria, none of which are given priority in bringing about an equitable division of property. McPhee v.McPhee, 186 Conn. 167, 170, 172. The same considerations apply to alimony. This court has concluded there is no basis for an award of periodic alimony.
The plaintiff withdrew $33,000.00 from his I.R.A. in late 1993 to purchase the Pontiac he now owns and for legal fees, (plaintiff's Exhibit #11). He testified he withdrew an additional $29,500.00 this year to pay 1993 taxes and for additional legal expenses. Since the plaintiff's adjusted gross income for 1993 was $78,100.00 after adding the I.R.A. draws and the defendant's adjusted gross income for 1993 was $81,513.00 (plaintiff's Exhibit #33), the court does not intend to charge back the 1993 withdrawals in allocating assets. As to 1994, the court notes the tax liability incurred for the 1993 withdrawals and that substantial additional legal fees were being incurred. Again, the court declines to treat such withdrawal as a charge back asset. The final I.R.A. withdrawal was for the New Hampshire real estate carrying charges. He will have the I.R.A. distributions tax liability to contend with again. CT Page 9743
The court's division of assets shall be equitable, but not 50%/50%, having reviewed the evidence in light of the statutory criteria.
The defendant has an established earning capacity that exceeds that of the plaintiff. Her social activities have impaired her capacity at the present time. It is not equitable that she benefit from her self-inflicted decreased earnings. The child support calculations on the plaintiff's worksheet are adopted.[2] The plaintiff's obligation is adjusted to $200.00 weekly, Section46b-215a-3(b)(1)(B) of the child support guidelines deviation criteria;Miller v. Miller, 181 Conn. 610.
The evidence leads the court to conclude that the plaintiff has the greater ability to acquire assets and to generate a higher income in the future.
The court enters the following decree.
1. Judgment is entered dissolving the marriage of these parties on the ground of irretrievable breakdown.
2. Sole custody of the two minor children is awarded to the defendant.
3. The plaintiff is awarded reasonable visitation on every other weekend from Friday 4:30 p.m. to Sunday at 5:30 p.m. and on every Wednesday from 4:30 p.m. to Thursday morning when he will be responsible for getting the children to their school or, in lieu of Thursday a.m. may return the children on Wednesday night at 7:30 p.m. Holidays defined as New Year's, Easter, Memorial Day, July 4th, Labor Day, Columbus Day, Veteran's Day and Thanksgiving shall be alternated. Christmas and Christmas Eve shall be alternated separately. Legal holidays that are celebrated on Monday shall be tacked onto the weekend. Mother's Day shall be celebrated with the defendant, and Father's Day with the Plaintiff. Each party shall have the children for a two week vacation period during the summer. The parties shall confer for finalizing the children's vacation plans.
4. The plaintiff is ordered to pay $200 weekly child support to the defendant, based on the deviation found supra. A contingent wage withholding order is entered. CT Page 9744
5. The plaintiff shall maintain medical insurance coverage as available for the children through his employment. The parties shall divide any uninsured bill balances 50%-50% for any care rendered the children. Section 46b-84(c) applies.
6. Each party shall maintain life insurance in the minimum amount of $200,000.00 naming the two children as primary beneficiaries until the younger attains majority. Proof of policy and premium payment shall be furnished on each anniversary of this judgment.
7. Each party may claim one child on the annual income tax returns, alternating each child each year. Any necessary forms shall be executed by either party.
8. The real estate known as 37 Maplewood Drive, Tolland, Connecticut and the remaining contents therein are awarded to the plaintiff who shall assume the premises as is and he shall hold the defendant harmless and indemnified.
9. The real estate known as the "retirement home" located in Washington, New Hampshire, and the contents therein, including the boat and the snowmobile, are awarded to the defendant who shall assume the premises as is and she shall hold the plaintiff harmless and indemnified.
10. The defendant shall retain the real estate known as 11 Centre Street, Mansfield, Connecticut as her sole property.
11. The plaintiff shall retain the 1994 Pontiac in his possession as his sole property.
12. The defendant shall retain the 1991 Nissan Maxima in her possession as her sole property.
13. The U.S. Savings Bonds are to be divided between the parties equally based on present redeemable value rather than face value.
14. The plaintiff shall retain his 401k Black Decker Savings plan, his IRA Vanguard Trust Co., and any Emhart pension rights, all free of any claim by the defendant.
15. The defendant shall retain the Prudential IRA, the Savings Bank of Rockville IRA, and the T. Rowe Price IRA, all free CT Page 9745 of any claims of the plaintiff.
16. The defendant shall retain her law practice assets free of any claim by the plaintiff.
17. The plaintiff shall retain his Savings Bank of Rockville accounts and the Sugar River Savings account all free of any claim of the defendant.
18. The defendant shall retain the joint Savings Bank of Rockville savings and checking accounts free of any claim of the plaintiff, i.e. those listed on the defendant's financial affidavit.
19. The children's trustee bank accounts are to remain for the benefit of the children, but made their property under the CUGTMA with both parents' signatures needed for withdrawals.
20. The debt claim of plaintiff for $240.00 child care expense is extinguished.
21. No periodic alimony is awarded to either party.
22. No allowance to prosecute or to defend is awarded.
23. Each party shall be responsible for the debts listed on their respective affidavits except the 1991 IRS tax liability shall be borne equally, including any interest or penalty.
24. All restraining orders concerning these parties are terminated.
Counsel for the plaintiff shall draft the judgment file.
HARRIGAN, J.
APPENDIX A
 CONNECTICUT CHILD SUPPORT AND ARREARAGE GUIDELINES --------------------------------------------------CT Page 9746 WORKSHEET A — PAGE 1
--------------------
JoAnn Paul Kenneth Paul NA — ------------ ----------- ---------------------- MOTHER FATHER NAME OF CUSTODIAN
COURT Waterbury JD D.N./CASE NO. 93-0117672S NUMBER OF CHILDREN 2 ------------ ----------- ---CHILD'S NAME DATE OF BIRTH CHILD'S NAME DATE OF BIRTH
— ---------- ------------- ------------ ------------- Ellen Paul 12/19/85 — --------- ------------- ------------ ------------- Andrew Paul 5/17/89 — --------- ------------- ------------- -------------
 I. Net Income Computation (Weekly amounts) MOTHER FATHER
----------------------------------------------------------------------- 7/26/94 Financial affidavit
 1. Gross income (attach verification) $ 735 $ 1108 7/27/94 financial aff. 2. Number of exemptions for tax purposes — — 3. Federal income tax — Test. S. Vecchitto** $ 25 $ 211 4. State and local income tax $ 15 $ 20 5. Social security tax or mandatory $ 103 $ 83 retirement/FICA/Medicare — Test. S. Vecchitto 6. Health insurance premiums (other than $ 35 $ 7 child) (7/27/94 Financial Affidavit) 7. Union dues or fees $ $ — 8. Unreimbursed work-related day care $** $**
9. Other alimony and child support $ $ — orders 10. Sum of lines 3 — 9 $ 178 $ 321 11. Net income (line 1 minus 10) $ 557 $ 787
 II. Current Support Determination
-----------------------------------------------------------------------
12. Combined net weekly income (nearest $10.00) $ 1344 13. Basic obligation (from schedule) $ 394 14. Check here if noncustodial parent is a CT Page 9747 low-income obligor (see instructions) 15. Child's health insurance premium $ — $ 13 16. Total obligation (Line 13 minus noncustodial parent's line 15 amount if line 14 is checked; line 13 plus line 15 total for all other cases) $ 407 17. Each parent's decimal share of line 12 (If line 14 is checked, skip this line and line 19, and enter the line 16 amount in the noncustodial parent's column on line 18.) 41.5 58.5% 18. Each parent's share of the total obligation (Line 17 times line 16 for each parent) $ 169 $ 238 19. Health insurance premium adjustment $ — $ 13 20. Social security benefits adjustment $ — $ — 21. Sum of lines 19 and 20 (for each parent) $ — $ 13 22. Recommended support amounts (Line 18 minus line 21) Subject to deviation $ 169 $ 225 23. Current support order (Noncustodial parent(s) only. If different from line 22 amount, explain in section VI.) $ $
 III. Total Arrearage Determination
-----------------------------------------------------------------------
24. Delinquencies on current support orders $ 25. Unpaid court-ordered arrearages $ 26. Past-due support (not court-ordered) $ 27. Total arrearage (sum of lines 24 through 26) $
 IV. Arrearage Payment Determination
-----------------------------------------------------------------------
28. Current support order from line 23 23 (or imputed support obligation for IV-D arrearages owed to the state or if child living with obligor) $ 29. Twenty percent (20%) of line 28 (or fifty percent (50%) of line 28 if there is, no child under age 18) $ 30. Noncustodial parent's line 11 amount $ 31. Fifty-five percent (55%) of line 30 $ 32. Line 31 minus line 28 $ 33. Line 28 plus $145 $ 34. Line 30 minus line 33 $ 35. Recommended arrearage payment $ (Smallest of lines 29, 32, and 34; or $5.00/month if child CT Page 9748 living with obligor and obligor's gross income is not more than 250% of poverty level; or the lesser of $5.00/week or line 34 for low-income obligor. If arrearages are owed to the state and the family, $5.00/month of this amount is allocated to the state, and the balance to the family.) 36. Arrearage payment order (At least $5.00/month unless line 34 is less than $1.00. If different from line 35, explain in section VI.) $
 V. Order Summary
-----------------------------------------------------------------------
37. Current support order $ 38. Arrearage payment order $ $ to state to family 39. Total arrearage $ $ to state to family 40. Total weekly support order (Line 37 plus line 38 total) $
 VI. Deviation Criteria Applied
-----------------------------------------------------------------------
41. Reasons for deviation from current support and/or arrearage guidelines: Sec. 46b-215a-3(b)(1)(B) "the parent's earning capacity." See also Yates v. Yates, 155 Conn. 544; Lucy v. Lucy, 183 Conn. 230; Carey v. Carey, 6 CSCR 240 (Barnett, Jan. 10, 1992). Defendant
Prepared by Title Date
 JoAnn Paul intentionally restricted her earnings during course of litigation and has demonstrated earning capacity in excess of Plaintiff Kenneth Paul. Testimony of Attorney B. Beck, K. Paul, J. Paul, Federal Income Tax Returns.